**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIE H. CAMPBELL, CAROL LOUISE CAMPBELL, and WILLIE H. CAMPBELL as Father and Next Friend of Edwin L. Campbell** | ) ) ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION  02-0184-KD-C** |
| **BROWN & WILLIAMSON TOBACCO CORP.**, *et al.*, | ) ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the following: defendants R.J. Reynolds Tobacco Co. ("Reynolds"), Brown and Williamson Tobacco Corporation ("B&W"), and Philip Morris USA Inc. ("PMUSA") (collectively referred to as "Defendants") motion for summary judgment (Doc. 113) and brief in support (Doc. 114 ) filed June 27, 2007; plaintiffs' response in opposition thereto (Doc. 119) , filed July 12, 2007, defendant Liggett Vector Brands, Inc.'s ("Liggett") motion for summary judgment (Doc. 120)[1] filed July 16, 2007; plaintiffs' response in opposition thereto (Doc. 121) filed July 17, 2007 and defendants' reply brief (Doc. 122) filed July 18, 2007.

I.    Procedural History

Plaintiff Willie Campbell ("Campbell") initially filed suit against various cigarette

---

[1] Defendant Liggett adopts by reference the motion for summary judgment and memorandum in support submitted by Reynolds, B&W and PMUSA.

1

manufacturers in the Circuit Court of Mobile County, Alabama on or about March 6, 2002 seeking redress for damages he alleges he suffered due to smoking cigarettes.  (See Doc. 1, Complaint) Plaintiff's initial complaint alleges claims of negligence, wantonness, breach of warranty, conspiracy, and liability under the Alabama Extended Manufacturers Liability Doctrine ("AEMLD")  (Id.)  Defendant manufacturers removed the action to this Court on or about March 20, 2002.  (Doc. 1, Notice of Removal)

On April 2, 2002 the parties filed a joint motion to stay the proceedings pending the Alabama Supreme Court's response to questions certified from the Eleventh Circuit Court of Appeals in Spain v. Brown & Williamson, 230 F. 3d 1300, 1312 (11th Cir. 2000) [2]  The motion to stay was granted on April 4, 2002.  (Docs. 8, 9)  Thereafter, the court granted the parties' joint motion for an order requiring plaintiff by June 25, 2004 to dismiss the action or amend the complaint to conform to Spain.  (Doc.20)  On June 25, 2004 plaintiff filed an amended complaint, adding as additional plaintiffs, Campbell's spouse, Carol Louise Campbell ("Louise") and the couple's adult son, Edwin Campbell ("Edwin")  (Doc. 21)

In response to plaintiffs' amended complaint, defendants filed a motion for a more definite statement requesting that plaintiffs provide their "brand history."  (Docs. 24, 25)

---

[2] Spain involved a wrongful death action arising out of a smoking-induced lung cancer. The decedent started smoking in 1962, and shortly thereafter become addicted to cigarettes.  He was diagnosed with lung cancer in 1998, and died in 1999. A wrongful death action was filed almost immediately, well within two years after the decedent's death.  After the case was removed to federal court it was dismissed for failure to state a claim. The plaintiff then appealed to the United States Court of Appeals for the Eleventh Circuit, which certified a number of questions to the Alabama Supreme Court, including the following question: "When does the Alabama statute of limitations for claims brought under the (Alabama Extended Manufacturer's Liability Doctrine), and claims premised on negligence, wantonness, breach of warranty and conspiracy begin to run in a smoking products liability case?"

Plaintiffs did not object to the motion and in response filed a Second Amended Complaint wherein the brand histories were outlined.  (Doc. 44)

The Second Amended Complaint contained the following five counts: Loss of Consortium (Count I), Negligence (Count II), Wantonness (Count III) , Breach of Warranty (Count IV), and Conspiracy (Count V).  Specifically, plaintiff Campbell alleged that he suffers from lung disease, emphysema, cardiovascular disease and "other health problems" as a result of smoking.  (Doc. 44) Campbell's spouse, Louise alleged that smoking has caused her to have "dirty lungs."  (Id.)  Finally, Campbell, on behalf of his son Edwin, alleged that Edwin "was born with severe  brain damage as a result of Louise having smoked while she was pregnant." (Doc. 44 at ¶ 35)[3]

On January 26, 2005 defendants filed motions to dismiss the complaint on the grounds, in sum, that the plaintiffs' claims were barred by the applicable statute of limitations as set forth by the Eleventh Circuit Court of Appeals in Spain v.  Brown & Williamson,  363 F.3d 1183 (11th Cir. 2004) (See Docs. 47, 48, 50, 51, 66)  By order dated April 7, 2006, the Court granted, in part, and denied, in part, defendants' respective motions to dismiss.  (Doc. 70) As a result of the Court's ruling, Willie Campbell's only remaining claim against defendants Brown & Williamson and Phillip Morris is wantonness accruing from March 1996.  Willie Campbell's only remaining claims against R.J. Reynolds and Liggett are for negligence accruing from March 2000 and wantonness accruing from March 1996.  Louise Campbell's only remaining claims against Brown & Williamson,  Phillip Morris and Liggett are for  wantonness  accruing from June 1998.

_____

[3]  In its order of April 6, 2006 the Court granted defendants' motions to dismiss all claims asserted on behalf of plaintiff Edwin Campbell.  (Doc. 70)

Mrs. Campbell's only remaining claim against R.J. Reynolds is for negligence accruing from June 2002.[4]

On November 30, 2006, defendants filed a motion for summary judgment on the grounds, in sum, that plaintiff's concession that he was diagnosed with emphysema and cardiovascular disease *prior to* 1996 bars his claims. (Docs. 87, 88, 92)  Plaintiff contested the motion, arguing that his subsequent hospitalizations in 1998 began a new limitations period. (Doc. 91)[5]

On April 27, 2007 the parties filed a joint motion to extend the discovery period by sixty (60) days. (Doc. 99) The motion was granted (Doc. 100)[6] and on May 22, 2007, the Court entered an order denying defendants' motion for summary judgment on the grounds that it was premature. (Doc. 104) Defendants filed the instant motions for summary judgment on June 27, 2007.  Plaintiffs Willie Campbell and Louise Campbell filed an opposition to the motions on July 17, 2007 (Doc. 121)  and defendants filed a reply brief on July 18, 2007 (Doc. 122).  The motions have been fully briefed and are now ripe for the Court's consideration.

II.     Factual Background

1.     Plaintiff Willie Campbell[7] alleges in his complaint that he became addicted to

---

[4]  Also remaining is Louise Campbell's loss of consortium claim which is derivative of her husband's remaining claims. (See Doc. 44, Second Amended Complaint, ¶¶ 38-40)

[5]  In response to the defendants' first motion for summary judgment counsel for plaintiff acknowledged that he had "no medical depositions at this point expressing any opinions as to whether Plaintiff's strokes, transient ischemic attacks and other medical problems are related to his smoking cigarettes...." (Doc. 91 at 5)  Plaintiff offers no medical deposition testimony in opposition to the instant motion for summary judgment.

[6]  Discovery in this action concluded on August 1, 2007. (Doc. 100)

[7]  References to "Campbell" or "Plaintiff" are to Willie Campbell.

nicotine at a very early age.  (Doc.44, Second Amended Complaint at ¶7.)   Campbell alleges

that due to his addiction, he is unable to stop smoking, despite being diagnosed with emphysema

and cardiovascular disease. (Id. at ¶¶ 7-9).

2.      Campbell further admits that he suffers from chronic bronchitis and has suffered

from emphysema since at least 1988.   (Doc. 114, Exhibit 7, # 2, 3)

3.      Campbell was diagnosed with "chronic bronchitis/emphysema secondary to

cigarette smoking" on May 10, 1986. (Doc.114, Exhibit 7  at # 5.)

4.      On June 8, 1989, Campbell had a right carotid thromboendarterectomy (TEA)[8].

On June 13, 1989, he was diagnosed with "arteriosclerotic cardiovascular disease with right

internal carotid stenosis and transient ischemic attack." (Doc. 114, Exhibit 7,  # 7,8)

5.      On June 14, 1990, Campbell was awarded Social Security Disability Benefits,

due, in part, to his arteriosclerotic heart disease and, in part, to his respiratory impairment which

was aggravated by a long history of smoking. (Id. at #12-14).

6.      On July 1, 1998, Campbell  was admitted to Providence Hospital with weakness

in his right arm and right leg with associated numbness.  (Doc. 119, Exhibit A.)

7.      On November 10, 1998, Dr. Henrietta Kovacs noted that Campbell suffered from

respiratory problems, high blood pressure, and probable transient ischemic attacks and advised

him to stop smoking.  (Doc. 119, Exhibit B)

8.      On April 20, 2000, Campbell was admitted to Providence Hospital with left side

weakness and parethesias. (Doc. 119, Exhibit C)  He was diagnosed with cerebrovascular disease

---

[8]   An operation that removes organized clotted blood (thrombus) from the pulmonary
arteries.

secondary to carotid atherosclerosis  and right carotid endarterectomy surgery was performed. (Id.)  Campbell was given a secondary diagnosis of tobacco use disorder. (Id.)

9.      On March 1, 2002, Dr. Archie Davis stated in his record that Campbell needed to quit smoking.  (Doc. 119, Exhibit D.)

10.     On October 29, 2002, Campbell was admitted to Providence Hospital with left side weakness.  (Doc. 119, Exhibit E)  He was diagnosed with a cerebrovascular accident, chronic obstructive pulmonary disease, carotid stenosis and asbestosis.  (Id.)

11.     On July 2, 2003, Campbell was admitted to Providence Hospital with transient weakness in the left face, left arm and left leg.  (Doc. 119, Exhibit F) He was diagnosed with recurrent transient ischemic attacks in the setting of his previous cerebrovascular accident. (Id.) Dr. Prestridge's noted that plaintiff was smoking against medical advice and secondarily that plaintiff had tobacco use disorder. (Id.)

12.     On July 16, 2003 and again on November 6, 2003, Dr. Prestridge's assessment, included "smoking/severe COPD/pulmonary asbestosis."  (Doc. 119, Exhibits G, H)

13.     On November 16, 2003, Campbell was admitted to Providence Hospital with left sided numbness and weakness and diagnosed, in part,  with "[r]ecurrent stroke/transient ischemic attacks while on Coumadin... and "ongoing tobacco use." (Doc. 119, Exhibit I.)  Dr. Greg McGee's impression included "history of heavy tobacco use."   (Id.)  Campbell's discharge diagnoses included tobacco use disorder. (Id.)

14.     On April 9, 2004, Campbell was admitted to Providence Hospital with left side tingling and numbness and diagnosed with recurrent transient ischemic attacks. (Doc. 119, Exhibit J.)  Campbell's discharge diagnoses included smoking against medical advice and

6

tobacco use disorder. (Id.)

15.     On August 3, 2004, Dr. James Hunter noted that Campbell continued to smoke and discussed the importance of smoking cessation.  (Doc. 119, Exhibit K.)

16.     On November 15, 2004, Campbell was admitted to Providence Hospital with "sever back pain and right leg pain [ ] also complained of heaviness in his chest at rest..... (Doc. 119, Exhibit L.)   Dr. Chad Alford's impression was tobacco abuse and he advised Campbell to stop smoking. (Id.)

17.     On April 14, 2005, Campbell was admitted to Providence Hospital and left carotid artery endarterectomy surgery was performed. (Doc. 119, Exhibit M).  Dr. Virkram Khetpal's impression included "[c]ontinued tobacco use and chronic obstructive pulmonary disease with asbestosis."  (Id.)

18.     On April 27, 2006, Campbell was admitted to Providence Hospital with chest pain.  (Doc. 119, Exhibit N) Dr. Allan Seibert's saw plaintiff on a consultation on April 27, 2005.  Under "social history" Dr. Seibert noted "[l]ifelong cigarette smoker.  Significant occupational exposure."  (Id.)  Dr. Seibert's impression included "acute exacerbation of chronic obstructive pulmonary disease." (Id.)

19.      Campbell was referred to Dr. Thomas Coleman who saw him "in consultation for Dr. Prestridge for evaluation of erectile dysfunction."  (Doc. 119, Exhibit N) Dr. Coleman noted that plaintiff has "hypertension and a long history of smoking plus asbestosis exposure."  (Id.) Dr. Khetpal was also consulted and remarked that plaintiff had a "[h]istory of chronic obstructive pulmonary disease and asbestosis with continued heavy tobacco use."  (Id.)

20.     On May 11, 2006, Campbell was admitted to Providence Hospital for recurrent

stroke and surgery was performed to repair a carotid artery aneurysm. (Doc. 119, Exhibit O.)  He

was discharged on May 26, 2006.  Dr. Prestridge's discharge diagnosis noted that Campbell

continued to smoke against medical advice. (<u>Id.</u>)  Dr. James Perrien's impression was

"cerebrovascular accident secondary to non-compliance and tobacco use." (<u>Id.</u>) Dr. Perrien noted

that plaintiff was "at one point placed on Coumadin, however, he chose not to follow up with his

Coumadin and essentially was subtherapeutic following discharge." (<u>Id.</u>)

21.    Campbell concedes that he suffered from COPD, a stroke and bronchitis prior to

1996. (Doc. 114, Exhibit 17, p. 478, Deposition of Willie Campbell) Campbell further concedes

that at least by 1996 he was aware of the dangers of smoking.  (<u>Id.</u> at p. 479)

22.    Louise Campbell alleges that as a result of defendants' conduct she developed

"dirty lungs and other health problems." (Second Amended Complaint at ¶ 36.)

III.    <u>Summary Judgment Standard</u>

Summary judgment should be granted only if "there is no issue as to any material fact

and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).[9]  The

party seeking summary judgment bears "the initial burden to show the district court, by reference

to materials on file, that there are no genuine issues of material fact that should be decided at

trial."  <u>Clark v. Coats & Clark, Inc.,</u> 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party

---

[9]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment
shall  be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact.  Id.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317 (1986))(footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert denied, 543 U.S.1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

IV.    Discussion

Defendants move for summary judgment on all remaining claims on two grounds.  First, defendants argue that based on plaintiffs' answers to interrogatories, plaintiffs have abandoned all underlying bases for their remaining claims except an alleged failure to warn.  Specifically, defendants argue that plaintiffs concede that they are no longer pursuing claims based on design or manufacturing defect, and further point out that plaintiffs produced no expert report on the issue.  The plaintiff provides no argument to the contrary.  Moreover, plaintiffs have failed to respond with any evidence of a negligent design or manufacturing defect.   Accordingly, only the

negligence and wantonness claims based on failure to warn will be considered.

    As to the failure to warn claim, defendants argue that pursuant to binding precedent from the United States Supreme Court and United States Court of Appeals for the Eleventh Circuit, failure to warn claims have been preempted under federal law since 1969 and, as a result, plaintiffs cannot base negligence and wantonness claims on an alleged failure to warn in the 1996-2004 time frame.  The court agrees.  See Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1197 (11th Cir. 2004) (Negligent failure to warn claim is pre-empted by the federal Labeling Act.)

    However, even assuming that the claims are not pre-empted, the plaintiffs' evidence fails to sufficiently establish causation.  To establish a negligent failure to warn claim, the plaintiff "must establish: (1) that the defendant had a duty; (2) that the defendant failed to provide adequate warnings of the hazards of a particular product, thereby breaching that duty; (3) that the breach was the proximate cause of the plaintiff's harm; (4) that the plaintiff suffered injury as a result." Bodie v. Purdue Pharma Co. 2007 WL 1577964 (11th Cir. June 01, 2007) (slip opinion). "Proof of injury or damage alone is, therefore, generally insufficient to establish negligence" Lowe's Home Ctrs., Inc. v. Laxson, 655 So.2d 943, 945-46 (Ala.1994)). "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty ... that ... proximately cause[d] the injury of which the plaintiff complains." Martin v. Arnold, 643 So.2d 564, 567 (Ala.1994).

    Defendants argue that plaintiffs have failed to satisfy the expert report obligation resulting in an inability to establish proximate cause.  Specifically, defendants argue that by

offering medical records of doctors other than the three who plaintiffs have identified as experts,

plaintiffs are attempting to end-run this Court's rules requiring expert disclosure and expert

reports.

The Rule 16(b) Scheduling Order entered in this action on May 18, 2006 provides, in

pertinent part:

> 5. EXPERT TESTIMONY...
> Expert reports are not required for treating physicians of
> plaintiffs to the extent that such physicians testify to personal observations,
> treatment and diagnosis of plaintiffs. If such physicians testify to topics going
> beyond what was required to provide plaintiffs with appropriate care (i.e.,
> causation or other testimony normally provided by experts in cases of this
> kind), however, an expert report will be required.

(Doc. 84 at ¶ 5).  The Court concurs that the medical records of the doctors are not sufficient in

their current form because they are in fact offered by plaintiffs to prove causation.  However as

explained *infra*, even if the medical records were considered, plaintiffs fail to offer sufficient

proof upon which a reasonable finder of fact could base causation.

Defendants maintain that in order to prevail on their negligence and wantonness claims

under Spain, plaintiffs must prove with expert testimony that cigarettes they smoked within the

specified limitations periods (March 1996- 2002 for Mr. Campbell, June 1998-2004 for Mrs.

Campbell) proximately caused their alleged injuries.  Defendants further argue that Louise

Campbell is unable to establish that she suffers from a cognizable injury.

In support of their motion for summary judgment defendants have submitted declarations

of various physicians, including the three identified by plaintiffs in their notice of experts. (Doc.

114,  Exhibit 1)  Milton Prestridge, M.D., plaintiff Campbell's primary care physician, states, in

11

sum, that he "cannot say that the conditions for which [he] treated Mr. Campbell were caused by his smoking cigarettes from the limited time of 1996 to the present." (Doc. 114, Exhibit 1, ¶ 3) Frank McPhillips, M.D., a vascular surgeon, who treated Campbell between 2000 and 2007 states, in part, that "Mr. Campbell has a history of asbestosis, a restrictive lung disease not associated with smoking but caused by asbestos exposure." (Id. at ¶ 4) Dr. Phillips further opines that he "cannot state affirmatively that the conditions for which (he) treated Mr. Campbell were in fact caused by cigarettes he smoked from the limited time of January 1996 to the present." (Id. at ¶ 5)

James Hunter, M.D., an internist and pulmonary specialist treating plaintiff Louise Campbell states, in part, that he saw Mrs. Campbell "once on August 7, 2003, for rash, cough, shortness of breath, and night sweats." Dr. Hunter "ordered and reviewed a chest x-ray on that date...[and][ ] interpreted her chest x-ray as showing 'dirty lungs.'" (Doc. 114, Exhibit 1 at ¶ 2) Dr. Hunter states that the term "dirty lungs" is a general descriptive term and "is not specific to cigarette smokers" and opines that "[i]f Mrs. Campbell's lungs did not appear 'dirty' in chest x-rays subsequent to August 7, 2003, then it is possible that the appearance of 'dirty lungs' on August 7, 2003 was artificial." (Id. at ¶¶ 3-4)

Defendants have also submitted similar declarations of physicians who have treated plaintiffs, but were not identified by plaintiffs as experts, along with declarations of several physicians who have reviewed plaintiffs' pertinent medical records. (Doc. 114, Exhibits 10-16) First, defendants submit the declaration of James Perrien, M.D., a neurologist and internist, who treated Campbell beginning in April 2000 on a referral "for evaluation of post cerebrovascular accident, transient ischemic attack, spinal stenosis, radiculopathy and various neuromuscular

complaints.  (Doc. 114, Exhibit 10)  Dr. Perrien states, in part that "[b]etween 2000 and 2006, [he] treated Mr. Campbell on several occasions for hemiparesis (partial paralysis or weakness) as a result of his cerebrovascular disease."  Dr. Perrien notes that "Mr. Campbell's medical conditions, including his asbestosis, pre-existed my treatment of him by several years."  (Id. at ¶ 2) Finally, Dr. Perrien states that he "cannot state that the conditions for which (he) treated Mr. Campbell were caused by his smoking cigarettes from the limited time of January 1996 to the present."  (Id. at ¶ 3)

Bryan Delaney, M.D., a general practitioner, declares that he has no recollection of seeing Mr. Campbell as a patient but has been shown records indicating that he saw Campbell from 1984-1986 for a lung impairment but has no knowledge relating to his medical treatment or care after that time.  (Doc. 114, Exhibit 12)[10]

Dr. Perrien also evaluated plaintiff Louise Campbell on September 9, 2003 "for complaints of leg and arm weakness and neck pain with radiation of pain to the arms bilaterally." (Doc. 114, Exhibit 11, ¶2 )  Dr. Perrien states that he "never evaluated Mrs. Campbell for chronic obstructive pulmonary disease ("COPD"), emphysema, or 'dirty lungs;...[but] noted no respiratory symptoms or complaints."  (Id.)  Dr. Perrien further noted that "[o]n [Mrs. Campbell's] physical history questionnaire dated 9/9/03...[she] reported no asthma, no COPD, and no emphysema."  (Id.)  Finally, Dr. Perrien states that he "can state affirmatively that the conditions for which [he] evaluated Mrs. Campbell were not caused by her smoking cigarettes from January 1998 to present."  (Id.)

_____

[10]  Dr. Delaney states that he has no records indicating that he treated Mrs. Campbell. (Id. at ¶ 4)

Dr. David Hassell, M.D. a radiologist, reviewed Mrs. Campbell's chest x-rays taken August 21, 2003 noting that Mrs. Campbell's lungs were clear and that he "observed no acute abnormality."  (Doc. 114, Exhibit 13) Dr. Hassell states that the appearance of "dirty lungs" is not specific to cigarette smokers and "can be caused by numerous airborne pollutants and is not uncommon in city-dwellers."  (Id. at ¶ 4)

Dr. Brad Stefler, M.D. , a radiologist, reviewed Mrs. Campbell's chest x-rays taken on October 6, 2004.  Dr. Stefler states that he observed that her lungs were clear and "observed no acute chest disease."  (Doc. 114, Exhibit 14)   Dr. Stefler notes that the term "dirty lungs" is not a diagnosis and does not describe an actual disease in progress.  Rather, Dr. Stefler states that 'dirty lungs' "can be caused by numerous airborne pollutants, previous infections, allergies, and other insults, and is not uncommon in individuals of [Mrs. Campbell's ] age."  (Id. at ¶ 4)

Dr. James Courtney, M.D., a radiologist, reviewed Mrs. Campbell's chest x-rays taken on December 4, 2005 and  found Mrs. Campbell's lungs to be clear and "observed no evidence of acute disease or 'dirty lungs.'" (Doc. 114, Exhibit 15) Dr. Courtney states that the term "dirty lungs" does not describe an actual disease and, in fact, "[t]he appearance of dirty lungs can also be artifactual if the patient takes a shallow breath."  (Id. at ¶ 3)

Dr. Julia Dannelley, M.D., an internist, and Louise Campbell's primary care physician during 2005-2006, states that she has never diagnosed Mrs. Campbell with "dirty lungs" and upon review of Mrs. Campbell's past medical records and laboratory tests concludes that she has a normal pulmonary function and does not have COPD.  (Doc. 114, Exhibit 16 at ¶¶ 3-4) Dr. Dannelley further states that "[i]f Mrs. Campbell had COPD "prior to August 21, 2006 , I cannot state that it would be a result of any cigarette smoking from the limited time of January 1998 to

August 21, 2006."  (Id. at ¶ 5)

Plaintiffs respond that their claims of negligence and wantonness against the defendants "are within the applicable statute of limitations because the plaintiff Willie Campbell has had multiple hospitalizations since 1998, each of which plaintiffs contend begins a new statute of limitations period."  (Doc. 119 at 1) Campbell further states the he "can prove proximate cause because he was exposed to cigarette smoke since 1996, the applicable time period, and suffered subsequent injuries and hospitalizations since that time to the present." Id. Plaintiffs discount defendants' reliance on the declarations of plaintiffs' treating physicians, which fail to relate plaintiff's smoking to his health problems during the applicable limitations period.  Instead plaintiffs argue that "the records of those same physicians are replete with notations that smoking is Willie's problem."  (Id. at 5)  Further, Campbell contends that he "has suffered multiple strokes and transient ischemic attacks, among other medical problems during the applicable statute of limitations period, i.e., since 1996." (Id.)  Finally, Campbell maintains that since his claims are still viable, his wife, Louise Campbell's, claim for loss of consortium, as a derivative claim, is also viable.  (Id.)

In Spain v. Brown & Williamson Tobacco Corp., 872 So.2d 101 (Ala. 2003) the Alabama Supreme Court held that "[t]he date [plaintiff] became addicted to nicotine is the date the statutory limitations period began to run as to[plainiff's] tort claims" Id. at 114.[11]  "A plurality

---

[11]  In answering the questions regarding the statute of limitations the Alabama Supreme Court opined, in part, as follows:

Addiction to nicotine is a compensable injury, at a minimum, in terms of the costs of supporting an addiction. Assuming no other physical injury has previously manifested itself, the economic loss attributable to supporting an addiction is the first injury a smoker addicted to cigarettes sustains, regardless of whether a

of the Alabama Supreme Court also concluded that the continuing-tort doctrine causes a new

limitations period to run every time a defendant commits a new tortious act which causes injury

to the plaintiff."  <u>Spain v. Brown & Williamson Tobacco Corp</u>, 363 F.3d 1183, 1189 (11th Cir.

2004).  The court noted that while the repeated sales by the manufacturer could be considered a

---

plaintiff frames the complaint to seek damages for that economic loss. That other
damages might follow, including, but not limited to, injury to the person, such as
shortness of breath, loss of the sense of taste and/or smell, coughing, and throat
irritation, as well as medical expenses, should not defeat the commencement of
the running of the applicable statutory limitations period. <u>See Garrett v. Raytheon
Co.</u>, 368 So.2d at 519 ("The cause of action 'accrues' as soon as the party in
whose favor it arises is entitled to maintain an action thereon. 'We have held that
the statute begins to run whether or not the full amount of damages is apparent at
the time of the first legal injury.' " (quoting <u>Home Ins. Co. v. Stuart-McCorkle,
Inc.</u>, 291 Ala. 601, 608, 285 So.2d 468, 473 (1973) (emphasis added))). Artful
pleading such as is presented here, where Spain disavows seeking a recovery for
all pre-cancer injuries, should not defeat the operation of the first-injury rule.

Where multiple acts are involved, subsequent damages have been recognized as
flowing from subsequent acts, and the fact that a limitations period may have
expired as to an earlier act does not bar an action for the subsequent injury.
However, the ongoing acts of the manufacturers are the repeated sales to a
consumer who at some point might recognize that an addiction makes the
consumer/smoker a participant in the additional acts and an enabler of their
continued occurrence. Under these circumstances, while a new period of
limitations for subsequent sales to an admitted addict of additional packs of
cigarettes containing warnings may produce additional injuries giving rise to new
causes of action with new limitations periods, significant problems of proof of
causation stand between a smoker and recovery. <u>See</u> <u>Nicolo v. Philip Morris,
Inc.</u>, 201 F.3d 29, 39 (1st Cir.2000), in which the United States Court of Appeals
for the First Circuit rejected a continuing-tort argument, noting: "Leaving aside
the absence of precedent in Rhode Island, the dispositive answer is that, given
plaintiff's knowledge that she had been 'hooked' since at least the early 1980s,
any subsequent dissimulation or misrepresentation by defendants as to their intent
and knowledge bore no causal relation to plaintiffs' [sic] condition."

<u>Id.</u> at 114-115 (internal citations omitted).

16

new tortious act, that at some point the admitted addict becomes an enabler of the conduct, i.e. personally responsible, and thus "significant problems of proof of causation stand between a smoker and recovery". Spain, 872 So.2d at 114.

The crux of plaintiffs' argument is that they suffered injuries as a result of the additional sale of cigarettes beginning in 1996 for Campbell and 1998 for Louise.   However, plaintiff has not provided sufficient evidence that they suffered new and distinct injuries *after* 1996 (and 1998 for Louise Campbell) which were caused by smoking.   Rather, plaintiff Campbell directs the Court's attention to various post 1996 medical records which reflect that he suffered various health problems, including several hospitalizations.  After each such hospitalization and consultation the referring physician noted that plaintiff was a habitual smoker and had continued to smoke over the years against medical advice.   While the records state that Willie Campbell was smoking against medical advice and it was recommended on numerous occasions that he cease smoking, many of the records submitted[12] are from the same doctors that have given declarations stating that they cannot say that plaintiff's smoking was the cause of the new illnesses.  With respect to Louise Campbell's independent claim that she suffers from "dirty lungs" the doctors state that the condition is not a disease and there is no evidence of a causal connection.

The medical evidence upon which plaintiffs now rely is insufficient to overcome the defendants' motion for summary judgment.   Plaintiffs have failed to establish that their smoking during the applicable statute of limitations window caused their alleged injuries. Moreover, even

---

[12] Defendants also argue that the records are impermissible hearsay and further that plaintiff has submitted medical records of doctors other than those identified by them as experts in an attempt to "end run this Court's rules requiring expert disclosures."  (Doc. 122 at 5)

if plaintiffs had sufficiently related the "new" injuries to smoking, plaintiffs have failed to

present any evidence that defendants' negligent or wanton failure to warn of the dangers of

smoking, rather than plaintiffs' choice to smoke, was the proximate cause of plaintiffs' injuries.

Accordingly, the Court finds that plaintiffs have failed to show a genuine issue of material fact

such that summary judgment would not be warranted.

V.      Conclusion

        Based on the foregoing, defendants' motion for summary judgment as to plaintiffs'

Willie Campbell and Louise Campbell's remaining claims alleged against them in the complaint,

is due to be and is hereby **GRANTED**.

        **DONE** this 6<u>th</u> day of September, 2007.

                                         S/ Kristi K. DuBose
                                        **KRISTI K. DuBOSE**
                                        **UNITED STATES DISTRICT JUDGE**